Good morning, Your Honors. Heather Conniff for the appellant, Paul Wexler. I'd like to reserve three minutes for rebuttal. So are you going to do all the argument? I noticed you have someone there. I'm going to do it. Is one person going to do all the argument? Okay, thanks. I just wanted to make sure we weren't splitting time. Okay, go ahead. So the District Court in this case improperly weighed the evidence in favor of the defendants and granted summary judgment. The District Court's job on summary judgment is to just see if there's enough evidence that creates a triable issue of material fact. And I believe that the evidence that we submitted on summary judgment created triable issues. What evidence creates tribal issues? There's key evidence that I would like to point out to the court and one of them is Exhibit 13, which is the 2013 Performance Review. Now during this time Plumlee had already issued a write-up to our client Mr. Wexler and shortly after this he's going to give him a performance improvement plan. But what's significant about the performance, the 2013 performance improvement plan is that he notes that Wexler met his job standards for sales results and then he goes on to say after this, and this is a direct quote from the review, that Mr. Wexler has had a difficult time moving away from the traditional detail rep. Now this... But do you contest that Mr. Wexler's performance was down during the second half of 2013 and in 2014? And how was this just the drop in performance related to JPI's alleged discrimination based on age? What I saw here it was the company went, you know, they went a different way and he didn't want to go that way. Well I believe that we disputes the fact that he wasn't performing during this time and one of those exhibits is Exhibit 15, which is the InvoCana report. Now Plumlee alleges that Mr. Wexler was not performing well as to that prescription but this report speaks to Mr. Wexler's performance at the time that he was terminated. The date on this report is July 11, 2014. And that's Exhibit 15 or 13? 15. Okay. And he is terminated two to three weeks after this but this shows that Mr. Wexler, out of his entire team, he's ranked number second in sales and his projected sales quota for this specific prescription drug was at a hundred and seven percent, which exceeds any sales goals that he set. But his overall sales quota, did he meet his overall sales quota or not? Well that's the thing is that defendants hasn't proved or submitted any corroborating evidence actually showing statistics or his rankings compared to the nationwide or to his team or to the district. There's nothing that actually they've submitted that actually shows these numbers. All it is is Plumlee saying in these write-ups that his numbers are down, your sales are lower, so there's an absence of anything that's supporting what they're actually saying about the actual sales numbers. And in fact in the 2013 performance review again, Plumlee acknowledges that he did meet these job standards, he met job standards as to sales results. And then in 2013, that's when he receives the President's Circle Award, that's our Exhibit 22. This was after the value-based selling approach was put into effect. Another thing that Plumlee is knocking our client on, and if this were the case, then why is he receiving a President's Circle Award for being the top 5%? Well, I think that what the evidence showed that he achieved the President's Circle status for 2012 based on sales numbers, right? Correct, it's for the year 2012. And in Wexler's 2012 year-end performance, Plumlee, who had become his district manager, advised that asking questions that are open-ended and generate serious dialogue with customers can help you better understand their needs, and told that this will be part of a work session coaching moving forward. Then in 2013, Mr. Wexler received an off-track mid-year rating that was critical of both his results and his leadership. I think the comments were his focus on fundamental elements, pre-call planning, value-based selling instead of show-and-tell, and building your knowledge and skill level with reprints. You've got a huge opportunity to boost your results in these remaining two quarters of this year. Do not lose sight of administrative duties. These are key job functions that need to be executed accurately. So then he also chastised Mr. Wexler for not meeting standards for reporting expenses. This contributed to a low year-end leadership rating in 2012 and an off-track, off-track mid-year rating this year. Not having active American Express card will certainly inhibit your job duties in the field and is unacceptable. The next step will be a PIP. Additionally, your performance with Invoncana is below standards, and we have had multiple discussions about the need for improvement in the area of product knowledge, market knowledge, value-based selling, and impact in your calls as evidenced by increased sales performance. Then at the end of 2013, he received an overall rating of four out of nine. Then he was informed it was time to enter into a PIP. March 7, 2014, he placed him on a PIP. The PIP set forth steps. Wexler was to improve his VBS skills, set up bi-weekly meetings, indicated that Pumley was available to provide support and would be reviewed for further action up to and including termination. They had, let's see, they conducted field coaching rides with Wexler, held bi-weekly discussions. His performance didn't improve. And on May 22, 2014, Pumley gave Wexler a final notice of unsatisfactory practices, warning that if the performance deficiencies were not corrected, his employment may be suspended. June 6, 2014, recorded that Wexler's performance with customers had not improved. On July 11, 2014, Pumley provided the Long Beach team with their sales rankings, which showed Wexler as last. Wexler does not contest that he was last. And on August 4, he was terminated. So what's wrong with any of those things? Well, a lot of what was just read, the substance of those write-ups in the subjective evaluations are usually a convenient way for employers to cover up a bias. And those aren't actually, again, objective, hard sales— But there were quotas set, so that's objective, right? Did he meet the quota requirements? We're alleging that he did. And there's nothing, again, that the defendants have produced that actually show hard numbers that he wasn't meeting his sales quota. If he was last in sales, if you're showing that it was protectual, you would have evidence that he was not last in sales. Was there evidence in the record that he wasn't last in sales? Again, I would have to point to Exhibit 15, which shows that he was projected to be the second in his team for the InvoCana sales. That's really all we have. And then the other evidence of his 12-year-long tenure of him consistently exceeding his sales goals and receiving awards for being in the top 5 to 10 percent. And then let's just say for the sake of the argument that defendants proved their legitimate termination reason, that doesn't stop the inquiry, and that's not dispositive of the fact that they have write-ups. It now that we've presented more than enough evidence to at least show pretext to get past summary judgment in this case. And that's the comments. One thing I want to point out is that the district court in this case didn't even mention or acknowledge any of our witness declarations that we have. We submitted three witness declarations, percipient witness testimony that corroborate what our client is saying about being treated unfairly compared to the younger sales reps. We have one precipitant witness that says he was personally told by Plumlee that he . . . Plumlee was calling our client outdated and a sore rep. Those are both negatively connotative age comments. And it also shows that Plumlee had discriminatory animus towards older sales reps. Didn't . . . but he still had . . . your client is not the oldest one on the team, correct? He had a 61-year-old and a 57-year-old, or is that that Plumlee had hired those people in the past? That's what defendants are alleging, but if you actually look at Plumlee's declaration, nowhere in his declaration does he say that he hired these individuals. The only evidence that defendants used that support this contention is their interrogatories, but that's very vague. It says Plumlee up until February 2015 hired, I think it was five sales . . . seven sales representatives. It was 61 and one was 57. Three others were over 40. But how many of them were on this team? That's my question. There was . . . we have evidence that Mr. Wexler was the oldest one on his team, and then the witness declarations also say that he was the oldest one on his team. So . . . Sorry, go ahead. Go ahead. No, go ahead. I don't have a question. So your . . . I just want to be sure I understand. Your contention is that where your client was alleged to have the lowest of the team only relates to one product and not the complete product line or otherwise? Well, that one report only shows how he's doing compared to that one prescription drug. One product line. I think he had two. That's correct. He's got more than one product line that he's responsible for, I assume. It's, I think, one other prescription drug, and it was Xarelto. But he's always performed at Xarelto. He's always had that prescription drug. There's . . . And there's no evidence in the record that you can say that he was below his quota? Other . . . Or any evidence that he met . . . So you're sure to say he was 107 percent above quota? Yes, and that he was projected to meet 107 percent of his quota at the time he was terminated. Defendants didn't even allow him to finish out that third quarter or even the year to see what his sales results were. And also, again, they did not provide any sort of documentation. They're a large company. They should have spreadsheets or something showing his ranking compared to other team members or district members or company-wide on how he's performing. Actual hard statistics, but they don't submit anything other than just plainly saying . . . Do you want to save any time for rebuttal? Yes, I do. Okay. Okay. Thank you. Good morning, Your Honors. Good morning. May it please the Court, my name is Catherine Levering. I'm together with Zoe Wilhelm, who is at counsel table. We're here on behalf of Janssen Pharmaceuticals, which is the correct name of the company, and also another defendant that I believe has been abandoned. At least it is not disputed that Johnson & Johnson Services, Inc. was not a proper defendant. You'll find that in the record at ER 796, the conclusion of law number 3. So I'm going to focus on Janssen Pharmaceuticals, which was the actual employer of Mr. Wexler. Two things I'd like to start with, and I'd like to start where Ms. year-end review, and she said that the review shows that he met job standards. That is not what the review says. The review itself is at ER 256 to 260, and what the review says is that overall, Paul, that's Mr. Wexler's performance, sometimes met job standards, but in key leadership and operational areas, he was below standards. It then goes on to document his poor performance with respect to the drugs that he was charged with selling. It goes on to forecast the next step in the process would be a performance improvement plan if his was preceded by an off-track mid-year 2013 review, which is at 259 of the record, and also a below-standards performance memorandum that was issued in late July of 2013. Ms. Levering, he's a salesman, right? Yes. Okay. And the salesman's gold standard is, are you meeting quota or not? And if you meet quota, the next year, your employer generally raises the quota until you reach a certain point where you can't reach your quota, and then it has to do with how well you get along with management as to whether you get kept. I see nothing in the record that says that he was below quota. Is there anything that says that he was below quota in the record? I think if you look at the performance reviews themselves, they provide data that is embedded in the reviews. Judge Barat, in looking at that evidence, pointed out the fact that there was no dispute from Mr. Wexler concerning the data that is embedded in any of those reviews. Obviously, that was open to him to do so. If, indeed, there was a contrast between what the review stated and what the actual performance was, there was no such conflict. Great job talking, but you haven't answered my question. Is there any evidence in the record that he operated below sales quota? Yes, I believe so, in terms of in the reviews themselves, there is. Now, there was mention of Exhibit 15. Exhibit 15 is this so-called Invocata Radin report. It's an unauthenticated document that was proffered by Mr. Wexler's counsel and objected to below by us. In evidence? Excuse me? Is it in evidence before? The judge didn't rule on the objections that we made. He didn't specifically rule on the objections, but what is pointed out, this is the document where they make reference to that Mr. Wexler was 100% of projected quota. If you look at that document, you'll see that the document shows what the sales goals were for everyone who was listed on that document. You will see in the Long Beach District, which is the district in which Mr. Wexler worked, that he was the lowest quota of anyone who was active in the district. The only exception to that was one person who had been on maternity leave from the previous September of 2013 and was not back to work by the time that this so-called Radin report was issued. The record also shows there is no evidence from Mr. Wexler that this Radin report was available to him or anyone at the time. But even though he had the lowest quota set for any sales rep, he still had a projected achievement of 107%. Does that have some significance in the analysis? Well, it doesn't because you're dealing with a document that really is based on inadmissible evidence to begin with. But to the factual point, if you look at 100% of projected quota, that is based on what you expect or hope for in the future. That's a trending document. Under the system that is used, it's uniform for everyone, it takes a while, it takes about three months for there to be actual sales results that are scrubbed by something called sales analytics, where you get actual sales results. So that is raw data that hasn't been tested. But what that raw data shows is that he is assigned the lowest quota, and the document that actually was proffered by I guess both of us, but it is at ER 616, it's a broadcast memo from Mr. Plumlee, who was the district manager to all of the Long Beach team members, and it shows the rankings based on the last available rankings from the company that he is dead last. And Mr. Wechsler didn't push back on that in his deposition. He admitted that he was dead last. What about his heat? There's a couple of things, random things in the record, and one is that he gets terminated, what, a few months before his stocks would vest or something like that? That was never developed in the record. It's immaterial. Well, is it in the record, though? It's based on his statement. There was no pursuit of claim based on that. Well, then also, too, I mean, what about JPI's response? What is JPI's response to Mr. Wechsler's allegation that Taryn Mast, who is younger than he, has performed poorly, but was promoted? The Stow Supplemental Declaration shows that she was number one on the team. And I don't know if it's in the record, but it's in the record.  That's based on hard evidence and numbers. So we're dealing with a contrast between a disembodied statement from someone who is not a Janssen pharmaceutical employee. She's a contract worker. Ms. Stier's declaration shows that she was a contract worker. She's not supervised by JPI management. She acknowledges that she's supervised by a Quintiles, which is her employer, supervisor. And that particular declaration, as I say, in its entirety was objected to. With respect to any statement that someone purports to make in a declaration, they have to show that, you know, they're competent to testify or to provide information. Okay. What's JPI's response to Mr. Wechsler's assertion that Plumlee gave him a written notice of unsatisfactory performance in a Starbucks coffee shop on May 22nd, 2014, even though Mr. Wechsler's PIP was not scheduled to end until June 3rd, 2014? The record shows that that's standard practice, that you get a final written warning. You get a final written warning. There's a series of different steps. That's not a termination. It's just a... Sales are poor. You're not meeting your quota. Again, the record shows that in the last 52 weeks of Mr. measured from September 2013, which was a date that had been mentioned earlier. It was the predecessor to the year-end review. The record shows, and this isn't controverted, that the 52 weeks before that, there wasn't any sales of Xarelta to certain accounts, and there hadn't been sales of Invokana to accounts. That caused there to be a shift, which is an approved process within JPI, a shift of certain accounts, and the methodology that was used was to only reassign the accounts in which there had been no impact, no sales for 52 weeks on both products. Fifty-two weeks on Xarelta, no sales prior to September 2013 when those accounts were moved, and also on the other product for which he was responsible, Invokana, no sales. So... The declarations show that, I believe the articulation is that he was one of the... There is no age information that is proffered by or in the record from the plaintiffs. There is the evidence from us. It's a verified interrogatory answer. He was replaced with someone 11 years younger, right? He was replaced by Mr. Chang in September of 2014. The termination took place on August 4th of 2014. So, yes, he was. But you're dealing... In this particular instance, it looks as if the direct evidence, which had been argued before that somehow or other you escape McDonnell Douglas, it looks like that's off the table. Under the McDonnell Douglas, one thing I do want to say, because it was brought up earlier, the... It was brought up by Ms. Coniff that there had been a statement that Mr. Plumlee had said that, without context and without dates, that Mr. Plumlee had said, had made a comment about Mr. Wechsler that he was slower and outdated than other reps. That is not what the Chang affidavit or the declaration says. And, again, this is something that we objected to below. The declaration reads, I heard that Plumlee makes comments about Wechsler stating that he is slower than other reps and outdated. We objected to that on the obvious basis of hearsay. And there's no anchor for the statement to begin with. And our objections are in the record at 904 and 905. It was objection number 66. And I would also point out that Mr. Chang's declaration makes no mention of age. It doesn't, even if it were relevant, and I suggest it isn't, doesn't even express a personal opinion or a personal belief that Mr. Plumlee had any age bias, the most that Mr. Chang says is that he thought that Mr. Wechsler could have been treated, was treated, quote, unfairly. And, obviously, that's not the test of what we're working with here. There were two things that the ‑‑ I just want to point out that Judge Burrott grappled with. Obviously, the prima facie case and the Goose v. Bechtel case, which is a California Supreme Court case that provides the framework for purposes of the McDonnell‑Douglas analysis in a FIA case. There were two impediments to moving forward on the prima facie case. One element of the four that you have to prove is that he was performing competently at the time he was terminated. Judge Callahan went through the litany, ending with that he was ranked last. And I will add one other undisputed fact to that, also the post‑PIP assessment by Mr. Plumlee, which essentially cataloged how Mr. Wechsler had performed as against the PIP, based on objective information, with which Mr. Wechsler did not take exception. Well, I guess what he would say would make a triable issue as to that, that he was terminated prior to the completion of his PIP, and despite his projection to meet 107 percent of his quota, and that Plumlee admitted that everyone on the team was up in sales and the entire district improved, yet he terminated Wechsler's. So you can say that was your conclusion, but the question is, is there a disputed fact on that? There's not a disputed fact that he was terminated prior to the PIP. The PIP itself has a date on it. I believe it is March the 6th of 2014. He was terminated on August the 4th of 2014, another undisputed fact. Well, but you say he doesn't make a prima facie case that he's competently performing the job. And what I was asking you is, do those comments make a disputed material fact of whether he was competently performing? No, I think that all of the evidence that went into the substantiation, and we didn't have a burden to do it, but we obviously substantiated our reason that he was terminated because he did not successfully complete the PIP. So then we get into the burden shifting. Well, I'm moving forward to that, because I think the evidence is fungible on that, in terms of it's transportable into the prima facie case, because it goes to the question of whether he was performing competently. It also moves, if you will, to the articulation of the reasons, which is that he did not successfully complete the PIP, and that earlier efforts to enhance and improve his performance just didn't get him across the line. Okay, you're overtime, unless any of my colleagues have questions. You've moved into overtime. They don't seem to. I would also just... You're overtime. I'm sorry. All the defendants are doing is urging the court to basically weigh the evidence in their favor. I think our evidence shows that there's a triable issue as to whether their termination reason was legitimate, and I also think that we presented a substantial amount of evidence of pretext. Mr. Wexler... Give me the best summary of your pretext. First of all, Wexler has a longstanding history with the company of consistently excelling at his job. He has 12 years of receiving President Circles Awards, salary increases, trips that he's won. We have direct evidence of discriminatory intent, which is through the age comments, both the ones made to Wexler by Plumlee that our client is alleging, and also the one made by Plumlee himself in the 2013 performance review, that older reps are harder to train. Mr. Wexler is a difficult time moving away from the traditional detail rep. We also have the absence of corroborating documentation from the defendants, actually showing that he was actually not performing, as well as they're saying that he did. We have the subjective criticisms in the write-ups. Well, do you dispute the fact that a company can change its model? No, I don't. And that employees are required to adapt to that? So there are instances where people could be good under one system. Like, for example, if we decide that a person was great writing notes on everything, but then they say you have to use a computer, and the person refuses to use a computer. Would that be legitimate? No, I agree that that's the case. However, I think that we've also showed a disputed issue that he was adapting, because in 2001, that's when they adopted the value-based system or model method. And then in 2012, that following year, he was presented with the President's Circle Award, which was during that time where he was having to do the value-based method. So I think we've created at least a dispute that he was actually following the method and succeeding at it. Going back to our other evidence of pretext, we have the percipient witness testimony about how he was being unfairly treated, and we also have evidence that he was replaced by someone younger, which I believe defendants admitted when they were up here. All right, you have 10 seconds, so wrap it up. Basically, our evidence shows that there's a tribal issue, and we believe that the judgment should be reversed. All right, thank you both for your argument, and this matter will stand submitted. This court is in recess until tomorrow at 9 a.m. Thank you.
judges: Callahan, Nguyen, Bataillon